# ATTACHMENT 2

DEPARTMENT OF VETERANS AFFAIRS
**Office of Inspector General**
**Washington, DC 20420**

**FOR OFFICIAL USE ONLY**
**Public Availability to be**
**Determined under Title 5 U.S.C. 552**

March 3, 2008

To: Ms. Brenda Stewart, Contracting Officer, VISN 16 (10N16)

Subject: Review of Southeast Restoration Cost Claimed for the Remediation of Floors 1-10 of VAMC New Orleans

1. Introduction

The Office of Inspector General (OIG) Office of Contract Review (OCR) initiated this review in response to a request from VISN 16 contracting authorities. Our objective was to evaluate the cost claimed under Purchase Orders (POs) issued to Southeast Restoration dba AfterDisaster (AD) in conjunction with the remediation of the VAMC New Orleans following Hurricane Katrina.

2. Background

Following the devastation of Hurricane Katrina in August 2005, VISN 16 contracting officials hired contractors to perform clean-up and remediation services at VAMC New Orleans. CCS Industrial Sales (CCS) was one of the first contractors brought in to help with the remediation effort. CCS utilized AD as a subcontractor. Eventually, AD also was issued POs as a prime contractor. By early February 2006, neither CCS nor AD had a significant on-site presence.

On September 9, 2005, Contracting Officer (CO), Bernice Griffin, issued the first solicitation, 502-28-05, to "remove 8-18 feet of water from the basement' of VAMC New Orleans. Contract V502P-2477 was issued to CCS on September 13, 2005 with a not-to-exceed amount of $180,000. On September 22, 2005, the pumping of the basement and subbasement was completed and two invoices were received and paid totaling $165,000. On September 26, 2005, CO Griffin issued contract V502P-2483, PO 502-C54323 to CCS to continue the remediation effort and "clear out and clean critical areas of the basement and subbasement." Between October 2005 and February 2006, COs issued 18 POs to either CCS or AD in conjunction with the remediation of VAMC New Orleans. By early February 2006, the effort was substantially complete. Many of the issued POs had been invoiced and paid. VA received CCS's last invoices nearly seven months after the contractor had left the worksite and AD's last invoices on May 16, 2007, over one year after the contractor had left the worksite.

On January 23, 2007, CCS submitted a certified claim related to PO 60329. On May 31, 2007, CCS filed a complaint with the Court of Federal Claims seeking declaratory relief and a judgment under the Contract Disputes Act for the balance of the invoiced amount, $1,519,696. A report issued on September 20, 2007, addressed the cost claimed under PO 60329.

On May 16, 2007, AD filed claims with CO Brenda Stewart under the Contract Disputes Act for five POs including 60194, 60204, 60216, 60218, and 60195 totaling $3,510,601.78. The contractor provided both original and revised invoices for "continued service deliveries." AD asserts that all five POs were verbal based on conversations with the Contracting Officer Technical Representative (COTR) Randall Braley. AD also asserts the following:

> On Friday, October 28, 2005 Department of Veterans Affairs Representative Maria Pizarro emailed AFTERDISASTER Purchase Order numbers, along with assurance that hard copies of the Purchase Orders would be mailed to within two weeks. Therein she stated "hard copies of these POs will be provided within two weeks." All invoices will be sent to Randy for processing. We never received the actual purchase orders.

AD asserts they never received copies of the POs. The claimed amount for each PO exceeds the estimated authorized amount.

On December 27, 2007, AD filed a complaint with the Court of Federal Claims for Provisional Relief by way of a Partial Money Judgment of $2,295,829.68 for services provided within the initial amounts established for the five POs. AD also seeks recovery of an additional $1,214,772.10 for services provided over and above the initial amounts established.

Contract Award and Administration

Except for two initial contracts issued by CO Griffin to CCS, one of which was subsequently cancelled without payment, there were no signed contracts between VISN 16 and CCS or AD. The CO generally issued POs with a written Statement of Work (SOW), with copies to be provided to the contractor up to 2 weeks later. In addition, there were day-to-day discussions and directions (some documented in emails and daily work plans) that added and/or revised assigned tasks.

The standard procedure was that the COTR entered the PO form 2237s into the Integrated Funds Distribution, Control Point Activity, Accounting and Procurement (IFCAP) system; the appropriate accounting appropriation was assigned; and the CO would formally issue the PO. POs were issued at estimated values to perform defined tasks. Contractors initiated tasks based on verbal orders from the Resident Engineer or the COTR. Some POs clearly state that it is "an estimated order" and the contractor "is not to exceed the amount on this PO without prior approval from the Contracting Officer." However, these statements do not appear on all POs.

The Resident Engineer and COTR have both stated that CCS and AD were informed that purchase orders were written as "not-to-exceeds" and that when billings reached 80 percent of the approved amount, the contractor was to notify VA. The Resident Engineer also stated that

VA had no idea where the contractor was with respect to billings because invoices were not submitted in a timely manner. The lag time between work performed and invoicing for many POs indicates the contractor failed to notify VA when they had reached 80 percent of the approved amount for this PO.

The combination of POs awarded without associated contracts, weaknesses in contract administration, and AD's use of an estimating system for billing (see AD Billing below) contributes to confusion regarding the type and volume of work to be performed and costs to be paid.

AMI Environmental

VISN 16 hired AMI Environmental (AMI) to monitor the efforts of various other contractors working on remediation of VAMC New Orleans. AMI provided VISN 16 with Daily Quality Control Reports from October 3, 2005 through June 10, 2006. These reports provide an independent assessment of the work performed, performance issues, environmental issues, and a record of discussions. Each report contained a minimum of seven elements of information, including: Work Performed Today, Results of Surveillance, Tests Required by Plans and/or Specifications Performed and Results of Tests, Verbal Instructions Received, Remarks, Results of Safety Inspection, and Submitted Subcontractor Documents.

AD Daily Work Plans

AD submitted daily work plans, including a summary of the previous day's work, to the VA Resident Engineer from October 31, 2005 through February 2, 2006. The last report concluded with:

> This will be our final daily report submitted. The only remaining tasks we have which will require our presence onsite will be taking additional measurements for completing the invoice, and picking up equipment/assets which remain on the property.

Although the work plans were repetitive in nature, they do provide additional data regarding events and the assignment of tasks. Plans also document some discussions, other assignments, and directions not specifically included in PO work descriptions.

AD Billing

In a December 8, 2005 status report, AD described the following billing procedure:

> As we have emphasized with the VA from the onset of this project, our normal pricing method is unit cost (Unit rate X number of units X number of days/square feet/cubic feet, etc.), which allows for an easier audit of services rendered. Accordingly, our invoices will be based on our standard unit prices on equipment and/or unit prices provided by Xactimate (our industry pricing standard) for New Orleans, LA. This "unit price" pricing method minimizes most customers'

> concerns about inevitable labor inefficiencies, since any resulting financial burden or perceived financial burden is borne by the contractor rather than the customer.
>
> Of course, some of our services will be invoices based on man hours, if there is no other reasonable alternative (some furniture/content manipulation/equipment setup & monitoring, etc.) Also, some pricing for contaminated area work will be increased due to difficult or hazardous work environments.

Although Xactimate is a detailed estimating system, it is not a billing system and does not capture actual costs. AD representatives tout one of the benefits of using Xactimate for billing is that the system does not pass on the cost of labor inefficiencies. However, it also does not pass on the benefit of labor efficiencies. There are also adjustment factors included in the estimating algorithms for overtime premium hours and judgmental factors such as "heavy" vs. normal pressure washing.

The Xactimate invoice does provide detailed visibility into the nature of the charges billed against the subject POs. It must be emphasized, however, that since Xactimate is an estimating system, it does not capture actual cost data. Depending on the type of agreement (fixed price, time & material, etc.); the ability of a billing system to capture actual costs and create an audit trail can be a significant issue.

Principal Work Breakdown Structure

The remediation effort consisted of eight principal tasks performed by CCS and AD which included clean-up of: the Basement and Sub-basement; Floors 1-10; Exterior Surfaces, Fencing, Tree and Vegetation Removal; Parking Garage; Building G; Miscellaneous Electrical Work; Domestic Water System; and Steam Boiler. Multiple POs were issued for some tasks. Appendix A provides a schedule of all POs issued including authorized, billed, and paid amounts.

3. Scope and Methodology

The scope of this review included a review of AD invoices submitted under POs related to the remediation of VAMC New Orleans. We obtained supporting documentation from Department sources, CCS, and AD. Documentation included purchase orders and invoices; daily work plans; correspondence, including email messages; timesheets; technical plans; various reports; and other documentation.

We reviewed supporting documentation, confirmed events with contractor and VA personnel, compared and verified claimed amounts to supporting documents, reviewed claimed costs for duplication, and tested various assumptions.

This report is focused on those POs submitted by AD as part of their claim. Other POs are discussed to the extent claimed and/or paid costs may relate to a PO that is part of AD's claim.

4. Results

a. Review of PO 60195

CO Pizarro issued PO 60195 to AD on October 27, 2005 for $1,500,000. The SOW includes the following:

> Provide all material and labor necessary to final clean floors 1 through 10 at the VAMC New Orleans, LA. Prior to commencement of cleaning operations submit for approval written procedures which will be utilized for cleaning and final clearance of the facility. Written procedures shall be developed with assistance from AMI. Additional activities to be included in this PO include but are not limited to:
> 1. Removal, cleaning, storage and reinstallation of cubical curtains on the 9th and 10th floors.
> 2. Disposal of all Sharps containers in accordance with established industry standards and included in the above referenced "written procedures".
> All personnel performing cleaning operation shall wear appropriate PPE as established by AMI and included in above referenced "written procedures."

AD submitted a 3-part invoice including the following:

| Part | Location | Amount |
|---|---|---|
| 1 | Floor 10G | $ 654,415.68 |
| 2 | Floor 9G | $ 466,498.38 |
| 3 | Floor 1G, Emergency Room, Patios | $ 264,585.26 |
| | Total | $1,385,499.32 |

No payments have been made against this PO.

We reviewed the invoice and the various supporting documentation provided for this PO. We compared this invoice to other PO invoices related to floors 1-10 for possible duplication of charges. Finally, we tested measurements used in the generation of the Xactimate estimates and reviewed the nature and type of charges against this PO.

There were 6 POs issued for various facets of the remediation and cleaning of floors 1-10, including 60134, 60192, 60219, and 60254 issued to CCS (AD performed as a subcontractor) and 60195 and 60204 issued to AD. PO 60204 is discussed below. Appendix A shows the PO, authorized amounts, payment, and invoices. Appendix B provides a discussion on the other POs issued for the cleanup of floors 1-10. The table below shows the PO, date, amount, and the principle assigned task:

| PO | Date | Amount | Principle Task |
|---|---|---|---|
| 60134 | 10/12/05 | $499,997.86 | De-humidification and air moving |
| 60192 | 10/27/05 | 500,000.00 | De-humidification of floors 1-10, follow-up to PO 60134 |
| 60219 | 11/10/05 | 500,000.00 | Reduce and maintain humidity |
| 60254 | 01/11/06 | 2,394,798.80 | Continue de-humidification process started under previous PO |
| 60195 | 10/27/05 | 1,500,000.00 | Final clean floors 1-10 |
| 60204 | 10/27/05 | 750,000.00 | HEPA equipment to scrub air on floors 1-11 |

PO 60195 was the only PO issued for general cleaning of floors 1-10. All other POs for floors 1-10 included some type of humidity control and air scrubbing.

<u>Error in Duct Cleaning Calculation</u>

Each part (10G, 9G, and 1G) of the PO 60195 invoice included costs for air handling, duct cleaning and decontamination work; and contained the following:

> The prices derived in this scope of work for air handling system and duct cleaning, decontamination, filter replacement, access panel installation, and coil cleaning are based on the same price per square foot as that charged to VA Contractor AMES Environmental for the same services in Quads G (Elevator Lobby) and Quad H. Comparison data for Quad H duct cleaning (the lower cost per SF) is as follows:
>
> The total cost bid, approved, and paid by the Veterans Administration for Quad H was $110,490 before AMES applied profit and overhead. The total SF in Quad H as "taken off" of scaled drawings provided by the VA is 24,021 SF – 7,463 SF on the 1st Floor, 6,887 SF on the 2nd Floor, 8,327 SF on the 3rd Floor, and 1,344 SF on the 4th Floor (Mechanical room). The total cost per SF was $110,490 divided by 24,091 SF = $4.90 per square foot. This is detailed in each room for the entire work area. If the VA determines that SF calculations are not accurate by scaling dimensions, these will be adjusted.

A review of the pricing methodology disclosed an error in the calculation. We agree that the total square feet is 24,021. However, when you divide $110,490 by 24,021, the rate is $4.60 per square foot, not $4.90. Therefore we question the difference or $.30 per square foot as shown below:

| Part | Ceiling Square Feet | Questioned Cost |
|---|---|---|
| 10G | 24,483.71 | $7,345.11 |
| 9G | 27,391.87 | 8,217.56 |
| 1G | 22,138.19 | 6,641.46 |
| Totals | 74,013.77 | $22,204.13 |

Adding the 10 percent for overhead and the 10 percent for profit, the total questioned duct cleaning cost is $26,644.95.

Overcharge for HEPA Vacuuming and Damp Wipe with Germicide

While reviewing the cost billed under this PO, we determined that VA was being overcharged for "HEPA vacuum" and "damp wipe with germicide" for some areas and items. There is a cost per square foot which is applied to the calculated square feet including ceilings, floors, and walls based on room measurements. Therefore, Xactimate charges for cleaning every square foot of wall, ceiling, and floor. Xactimate also applies specific charges for the cleaning of items such as windows, heat registers, light fixtures, baseboards, and cabinetry. Based on our review, windows and other items in walls, ceilings, and floors were charged as individual items and also included in the square foot calculations. When asked about including these items in the room measurements, AD provided the following:

> Xactimate allows the user an opportunity for each opening included in the sketch, whether windows, doors, missing walls, cased openings, etc. to subtract out the square footage for these items from its calculation of "variables" contingent on the room size. For doors, windows, and openings, the most applicable area where this affects total square footage is on the wall square footage. The data entry person makes the choice to "ignore opening when calculating variables" if he/she wants to include the SF of the door opening in the SF to be cleaned.

When room measurements were entered to generate the billing for this PO, certain doors, lights, registers, base boards, chair rail, windows, and cabinetry were not excluded from wall and/or ceiling dimensions. A room by room review of the invoices for 10G, 9G, and 1G disclosed items which should have been deducted from wall and/or ceiling dimensions. Since the input to the Xactimate estimating system did not deduct for items that reduced the square feet of walls and ceilings to be cleaned, the following overcharges occurred:

| Part | Doors | Lights | Registers | Base boards | Chair Rail | Windows | Cabinetry | Questioned Cost |
|---|---|---|---|---|---|---|---|---|
| 10G | $0.00 | $1,289.68 | $419.24 | $908.48 | $368.90 | $1,795.50 | $186.01 | $4,967.81 |
| 9G | 0.00 | 1,500.24 | 483.16 | 969.88 | 335.31 | 1,767.15 | 405.94 | 5,461.68 |
| 1G | 2,189.02 | 221.84 | 340.28 | 476.24 | 178.69 | 680.40 | 443.19 | 4,529.66 |
| Totals | $2,189.02 | $3,011.76 | $1,242.68 | $2,354.60 | $882.90 | $4,243.05 | $1,035.14 | $14,959.15 |

Adding the 10 percent for overhead and the 10 percent for profit, the total questioned HEPA vacuuming and damp wipe cleaning cost is $17,950.99. Detailed information is available to support the calculations and will be provided upon request.

Total cost questioned for PO 60195 is $44,595.94 including $26,644.95 related to the air duct cleaning rate error and $17,950.99 for overcharges for HEPA vacuuming and damp wiping with germicide.

b. Review of PO 60204

CO Pizarro issued PO 60204 to AD on October 27, 2005 for $750,000 with the following SOW:

> Provide all labor and material to place and maintain HEPA equipment at VAMC New Orleans, LA to scrub air on Floors 1 through 10. HEPA equipment will remain in operation until building environment has been cleared. Units shall be placed to accomplish one (1) air exchange per hour.

The PO also includes the following regarding the estimated amount:

> ***ESTIMATED PURCHASE ORDER*** Contractor shall not exceed the estimated amount on this Purchase Order without written approval from the Contracting Officer. The Government will not be obligated for work performed that exceeds the amount on the face of this PO with [sic without] a modification.

AD originally submitted invoice 22806 for $749,982.83 representing costs from November 8, 2005 through December 9, 2005. This was supplemented by the claim invoice for $1,069,573.46 representing costs from December 10, 2005 through January 13, 2006. The total amount claimed for 60204 is $1,819,556.29. No payments have been made against this PO.

We reviewed the invoices and the various supporting documentation provided for this PO. We reviewed the invoices for the number of air scrubbers, the rate and the number of days charged, and other charges. We also compared this invoice to other PO invoices related to floors 1-10 for possible duplication of charges.

Costs submitted under this PO represent a daily rental charge for Air Scrubbers and extension cords, labor to place and remove Air Scrubbers, labor and material related to the replacement of filters, and transporting the Air Scrubbers back to North Carolina.

Number of Air Scrubbers

A review of the PO SOW disclosed the following statement regarding the number of air scrubbers: Units shall be placed to accomplish one (1) air exchange per hour. The Resident Engineer, Ben Coe reviewed the space in floors 1-10 to determine how many air scrubbers were required to provide the required air exchange. He calculated the space and concluded the following:

> For floors 1-10 in New Orleans, I calculated the space to be approximately 7,333,510 cubic feet; to supply 1 air exchange per hour it would take 123 negative air machines.

A review of AD's correspondence with the Project Manager disclosed a letter dated October 27, 2005 (the same date as the PO) which included the following regarding air scrubbers:

> Most remedial protocols typically require a minimum of 3-4 air exchanges per hour. However, in this case we believe we can accomplish the task with fewer air scrubbers yielding 1 air exchange per hour which is substantially less expensive.
>
> This is subject to approval of AMI Environmental, Inc. as they may require more air exchanges per hour. AMI will also specify the number of filter changes required to promote minimum indoor air quality measurements (maximum number of colony forming units, maximum particulate counts in ambient are, etc.), which will ultimately result in successful clearance tests.

This memo calls for 74 air scrubbers at an estimated cost of $756,000 for air scrubber rental and all other associated costs.

Based on the conclusion reached by the Resident Engineer, we question the cost of the last 70 air scrubbers and extension cords placed into service on floors 1-10. We do not question that the air scrubbers were on floors 1-10. The questioned cost calculation is shown below:

| | Air Scrubbers | Extension Cords |
|---|---|---|
| Cost per day | $120.00 | $3.00 |
| Number of days | 54 | 54 |
| Questioned per unit | 6,480.00 | 162.00 |
| Questioned units | 70 | 70 |
| Questioned cost | $453,600.00 | $11,340.00 |

Adding overhead and profit to the total of $464,940 ($453,600 + $11,340), brings the total questioned cost to $557,928.

Removal of Air Scrubbers

On December 8, 2005, AD provided COTR Braley with "an update on aspects of work we are performing." The letter states that AD has approximately 102 air scrubbers in the basement (under the basement cleanup purchase order through CCS) and 192 in other areas of the hospital (under the purchase order issued directly to us – we should not exceed that purchase orders based on current schedule)." On Friday, January 13, 2006, Resident Engineer Coe directed AD to "shut down and remove all of the air scrubbers that have been placed throughout the NOVAMC as of 1/13/06." Coe also asked that "as of 1/13/06 I am asking you to submit your invoice for this equipment." AD responded on January 14 that "the air scrubbers have been shut down per your direction."

We reviewed invoices for compliance with the Resident Engineer's instruction to remove all air scrubbers as of January 13, 2006 and found that all billing was discontinued appropriately.

Duplication and Overcharge for 14 Air Scrubbers

The original invoice submitted under this PO includes cost for 193 air scrubbers installed over the period of November 8 through November 21 with billing through December 9, 2005. The claim invoice includes cost for 193 units from December 10 through January, 13, 2006 and 7 additional units from December 17 through January 13, 2006.

A comparison of this invoice to one submitted under PO 60329 shows duplicate daily rental charges for 7 Air Scrubbers and extensions cords installed on December 17, 2005 were charged and recovered under CCS invoice 1173. AD included the 7 Air Scrubbers with Air Movers, Dehumidifiers, and Barrel Fans for floors 1-10 on invoices 122005, 122705, 10306, 11006, and 11706 submitted to CCS. CCS included this cost on invoice #1173 submitted under PO 60329. Based on the invoice, the Air Scrubbers were installed on December 17, 2005 and charges continued through January 13, 2006 when they were removed. The total submitted amount under this PO was $28,929.60. This represented 7 air scrubbers and extension cords at $123 per day ($861 total per day) for a total of 28 days ($24,108) plus 20 percent for overhead and profit. Since these 7 air scrubbers are claimed on this PO, we question this amount for PO 60204.

Also, our review of AD's revised claim invoice for PO 60204 shows that they are claiming the same amount for 7 air scrubbers put into service on December 17, 2005. However, our review of AD's daily work plan, dated December 19, 2005, disclosed the following:

> Monitored air scrubbers throughout the hospital. These will continue to run until all air handling systems are fully operational, tested and balanced by others, and until duct cleaning is completed. We replaced 7 air scrubbers needing repairs, with 7 new ones in 1-F. Each air scrubber has had and continues to have a 50' extension cable supplying power to it.

We concluded that these air scrubbers installed on December 17 were actually replacements, and not new units; thus, there should have been no additional charges under PO 60204 for these 7 air scrubbers. Therefore, we question an additional $28,929.60 for PO 60204.

Total questioned costs related to PO 60204 are $615,787.20 which is comprised $557,928 for 70 air scrubbers which were not required or agreed upon and $57,859.20 for overcharges and duplicate billings for 14 air scrubbers.

c. Review of PO 60194

CO Pizarro issued PO 60194 on October 27, 2005 with an estimated total cost of $75,000 and the following SOW:

> Provide all labor and materials required to:
> 1. Power wash all exterior stained surfaces in accordance with direction from on-site Resident Engineer.
> 2. Remove all damaged trees and shrubs from the VAMC New Orleans, LA site in accordance with direction from on-site Resident Engineer.

AD states that they did not "receive an official copy" of this PO. AD is claiming a total of $172,180.57 under this PO. Invoice 31306, dated May 16, 2006, includes $74,971.07 under the original invoice and $97,209.50 under the claim invoice. Since there was a single payment of $74,250 on June 13, 2006, AD is claiming the balance due of $721.07 under the original invoice and $97,209.50 under the claim invoice. We reviewed the total cost claimed under PO 60194.

The original invoice included the following elements of cost:

| | |
|---|---|
| Power Wash/Germicide | $56,449.87 |
| Personal Protective Equipment | 1,335.92 |
| Material and Sales Tax | 4,690.10 |
| Overhead | 6,247.59 |
| Profit | 6,247.59 |
| Total Original Invoice | $74,971.07 |

The claim invoice includes the following elements of cost:

| | |
|---|---|
| Power Wash/Germicide | $78,258.05 |
| Material and Sales Tax | 2,749.87 |
| Overhead | 8,100.79 |
| Profit | 8,100.79 |
| Total Claim Invoice | $97,209.50 |

The invoices are based on a combination of actual and Xactimate estimated cost based on a cost per square foot charge for power washing and for application of an anti-microbial agent (germicide) to the cleaned concrete, pavement, and brick surfaces. There was also an adjustment for cleaning during performed during regular time vs. cleaning "after hours/overtime." Both power wash and germicide charges were based on 67 percent of the effort during regular hours and 33 percent after hours or overtime.

We reviewed the invoices and the supporting documentation provided for this PO. We reviewed the invoices for the number of air scrubbers, the rate and the number of days charged, and other charges. We also compared this invoice to other PO invoices related to floors 1-10 for possible duplication of charges.

On October 27, 2005, AD sent a letter to Project Manager Braley as a follow-up to a discussion which had taken place that day. The letter included the following description and estimate for power washing:

> This process will consist of low pressure degreaser/surfactant application and high pressure rinse/wash down of all concrete, brick, stucco, and masonry surfaces which sustained damages due to flood water, contaminated sewage water, and diesel fuel. All masonry surfaces on parking lots and walkways, and a 3' high band around the perimeter of the structure sustained damages. The cost for this service is $.48/SF, which is for "clean with pressure/chemical spray-very heavy",

> and is directly out of the national pricing guide, Xactimate, for the 4th quarter of 2005 in New Orleans. Total estimated cost, per your request, for this service is $75,000.

In follow-up communications, AD representatives stated that did not realize the cost for power wash/germicide would exceed the $75,000 estimate until "after the job was completed; after all field measurements were obtained and after unit costs were applied to the areas where work was performed."

Based on AMI daily reports, AD began power washing of exterior concrete on or around October 13, 2005 and continued until on or around November 10, 2005.

<u>Unnecessary Germicide Application</u>

AD submitted invoices for $172,180.57 for site cleanup/power scrub. AD charged $.48 per square foot for cleaning "concrete/pavement/brick surfaces with pressure/chemical spray" during regular time and $.66 per square foot for overtime cleaning. Germicide application was charged at $.16 per square foot for regular time and $.22 per square foot for overtime application. Sales tax as applicable and profit and overhead are added at 10 percent respectively are added to the direct cost.

Germicide application is not included in the scope of work for this PO. AD representatives stated that "although AMI had visited the jobsite, we had not received clear direction from them as to what the cleaning requirements for the property would be. It was later determined that germicide applications to all affected surfaces were to be employed."

We asked the Resident Engineer to contact AMI to determine whether AMI ordered germicide application for these exterior surfaces. AMI representatives, who were on site during the recovery effort, stated that they did not provide the direction to AD, nor was it documented in their work plan to apply the germicide. The only areas of decontamination were in the areas that were to be reoccupied inside the hospital. Since the germicide application was outside the scope of work for this PO, it was not ordered by the VA or by AMI, we questioned the cost claimed for germicide application. Direct cost questioned for germicide application is $20,726.47. Adding overhead and profit, the total questioned is $24,871.77.

AD is claiming a total of $172,180.57 under this PO. The amount claimed must be reduced by the payment of $74,250 resulting in a balance due of $721.07 from the original invoice and an additional $97,209.50 for the claim invoice. Our total questioned cost is $24,871.77, including overhead and profit.

d. Review of PO 60216

CO Pizarro issued PO 60216 on November 11, 2005 with an estimated total of $75,000. The SOW included the following:

> Provide all labor and material to:

- Remove and dispose of all trees, shrubs and vegetation damaged as a result of Hurricane Katrina. All items to be removed and disposed of will be identified by the on site Resident Engineer. Disposal of removed items shall be in accordance with Federal, State and Local regulation. All permits required shall be the responsibility of the contractor.
- Remove and dispose of 3 inches of top soil contaminated by Hurricane Katrina and subsequent flooding. Area of removal shall be determined by the on site Resident Engineer. Disposal of removed earthen material shall be in accordance with ALL Federal, State and Local regulations. Removal shall bee accomplished in accordance with Work Plan provided by the Contracting Officer. Disposal of contaminated soil shall be supported by manifest if required.
- Replace removed topsoil. Topsoil shall be clean of all vegetation and rocks ¾ inch and larger and debris. Submit sample of topsoil to be used to the Resident Engineer for approval. Place topsoil and consolidate to eliminate all clods and provide a smooth planting surface. Submit sample of topsoil to Resident Engineer.

The PO also includes the following regarding the estimated value:

> ***ESTIMATED PURCHASE ORDER*** This is an estimated order and the Vendor cannot exceed the amount on this PO without prior approval from the Contracting Officer.

AD is claiming a total of $88,504.55 including $74,921.55 for services provided "based on Verbal" PO and $13,583 for "additional services." Although this invoice had been submitted prior to the claim, it has not been paid and is, therefore subject to dispute.

We reviewed the invoice and the various supporting documentation provided for this PO. We also compared this invoice to other PO invoices related to floors 1-10 for possible duplication of charges. Finally, we tested measurements used in the generation of the Xactimate estimates and reviewed the nature and type of charges against this PO.

Although a portion of this SOW duplicates effort included under PO 60194, AD only claimed cost for the removal of trees and shrubs under PO 60216. While performing under this PO, it was determined, with Government concurrence, that the removal and replacement of the top 3" of top soil was not necessary, however the estimated value of the PO was unchanged.

The original invoice for $74,921.55 includes $29,395.24 of subcontract cost based on claimed actual hours expended in the following categories:

- Tree and Vegetation Removal
- Raking and Weed eating
- Leaf Blowing/Debris Blowing
- Moving concrete receptacles

- Removal of construction materials from paring lot (sand, brick, pallets, and fence)
- Removal of concrete planter from driveway
- Personal Protective Equipment
- Vehicle Removal

The invoice also includes $32,859.34 of Xactimate based charges per square foot for cleaning concrete areas prior to pressure washing. The invoice describes this effort as "initial debris removal – this was performed between early October and mid-November when the tree and vegetation removal began."

The claim invoice for $13,583 includes $5,171.39 for subcontract effort – "stump removal by CCS Industrial Sales, Inc." and $8,411.61 in Xactimate generated charges for additional debris cleanup.

We found no basis to question any of the claimed cost under this PO.

e. Review of PO 60218

CO Pizarro issued PO 60218 on November 11, 2005 for $85,000 with the following SOW:

> Provide all labor and material to power wash floor surfaces of Parking Garage at VAMC New Orleans, LA. Power washing shall be accomplished in accordance with the Work Plan provided by Contracting Officer through the on site Resident Engineer. MSDS sheets shall be available for all chemicals used for cleaning purposes.

The PO also contains the following:

> ***ESTIMATED PRUCHASE ORDER*** Garage area received considerable debris as a result of Hurricane Katrina. This is an estimated purchase order and contractor is not to exceed amount on this PO without prior approval from the Contracting Officer.

AD is claiming a total of $119,111.05 under this PO. AD agreed to and provided a 50 percent discount off of the Xactimate estimated pricing for this work. This invoice represents the cost to sweep and power wash the garage. Sweeping was charged at $.16 per square foot for regular time and $.24 per square foot for overtime. The rate for power washing was $.32 per square foot except for "very heavy" washing areas which were charged at $.48.

We reviewed the invoice and the various supporting documentation provided for this PO. We also compared this invoice to other PO invoices related to floors 1-10 for possible duplication of charges. Finally, we tested measurements used in the generation of the Xactimate estimates and reviewed the nature and type of charges against this PO.

<u>Claimed Cost for Sweeping</u>

Using Xactimate's estimating methodology, AD charged for sweeping and power washing garage parking decks and the perimeter walls up to 3 feet high. There were two adjustment factors utilized in the Xactimate estimate "very heavy" vs. "heavy" power washing and regular vs. overtime. Lower decks were charged at a "very heavy" cleaning rate of $.48 per square foot for regular time and $.66 per square foot for "after hours" or overtime. Higher decks were charged $.32 per square foot for regular time vs. $.43 per square foot for overtime. We tested the percentage estimates used for regular vs. overtime and take no exception based on the data provided.

On November 7, 2005, AD sent a memo to COTR Braley with "an update on the work we have underway." Under the heading <u>Task Orders/Purchase Orders for work requested but not yet issued to us by VA</u> for "Sweep, Power/pressure wash the parking deck (8 floors)" was the following:

> We have received several verbal directives for this task. However, we need clarification in writing on the Purchase Order/Task Order about the specific steps we are to perform (sweep only, pressure wash only, sweep and pressure wash, sweep and pressure only in some places, etc.).

Discussions with the Resident Engineer, Ben Coe revealed that the initial discussion with AD related to sweeping the garage. An email from Lee King to COTR Braley and CO Pizarro, dated November 11, 2005, 12:51 PM, provides an estimate for "sweeping floors in the parking deck" for $85,000 including $11,000 for contingencies. The Resident Engineer recalled a follow-up discussion with the AD representative wherein it was stated that the cost to power wash the garage would not be significantly higher than the proposed sweeping effort.

A second November 11, 2005 email from Lee King to COTR Braley and CO Pizarro, at 6:50 PM, provides an estimate "per your request" for "pressure washing (versus hand sweeping)." The total estimate is $154,839.00; however, the email adds that "due to the amount of SF, we believe we can complete this job for approximately ½ of the book price – $75,000." The email also requests an additional $10,000 for "unforeseen circumstances."

On November 16, 2005, 12:51 PM, AD emailed CO Pizarro and COTR Braley providing an estimate of $73,799 plus $11,000 for "unforeseen circumstances" for "sweeping floors in the parking deck" based on estimated square feet of 461,248. This email does not mention or include the 50 percent discount. CO Pizarro replied that she could not accept $11,000 for contingencies.

On November 16, 2005, 7:31 PM, AD emailed CO Pizarro, with a copy to COTR Braley, the following:

> Please revise the PO for pressure washing the parking decks to reflect the amount of $73,799. Our final invoice will be based on actual measurements anyway.

COTR Braley responded to AD instructing them to submit their invoice "indicating that it is your final invoice."

The scope of work for PO 60218 clearly does not include sweeping the garage deck. VA and AD representatives discussed the fact that power washing could be completed for nearly the same price as sweeping. The November 11, 2005, 6:50 PM, email (discussed above) provided an estimate for power washing the garage in lieu of sweeping. Therefore, we question the $61,421.23 ($19,158.13 + $42,263.10) claimed for sweeping the garage. Adding overhead and profit brings the total questioned to $73,705.47. With the 50 percent discount, net questioned cost for PO60218 is $36,852.74.

5. Conclusion

Our conclusions regarding these five POs are summarized in the following table:

| PO | Original Invoice | Additional Amount Claimed | Total Claim | Questioned | Not Questioned |
|---|---|---|---|---|---|
| 60195 | $1,385,499.32 | $ 0.00 | $1,385,499.32 | $ 44,595.94 | $1,340,903.38 |
| 60204 | 749,982.83 | 1,069,573.46 | 1,819,556.29 | 615,787.20 | 1,203,769.09 |
| 60194 | 721.07 | 97,209.50 | 97,930.57 | 24,871.77 | 73,058.80 |
| 60216 | 74,921.55 | 13,583.00 | 88,504.55 | 0.00 | 88,504.55 |
| 60218 | 84,704.91 | 34,406.14 | 119,111.05 | 36,852.74 | 82,258.31 |
| | $2,295,829.68 | $1,214,772.10 | $3,510,601.78 | $722,107.65 | $2,788,494.13 |

*(original signed)*

MARK A. MYERS
Director, Division A
Office of Contract Review (55)

MARK MYERS

Digitally signed by MARK MYERS
DN: CN = MARK MYERS, O = Department of Veterans Affairs, OU = Dept. of Veterans Affairs, Internal Staff
Reason: I attest to the accuracy and integrity of this document
Date: 2008.03.03 14:03:57 -05'00'

Appendixes

A – Purchase Order Invoice Map
B – Remediation of Floors 1-10

cc: Mr. Armando Rodriguez-Feo, Attorney, US Department of Justice

**Appendix A**

Appendix A

Purchase Order Invoice Map

| Task | Purchase Order | | | Payments | | Invoice | | |
|---|---|---|---|---|---|---|---|---|
| | No. | Date | Amount | Date | Amount | No. | Date | Amount |
| Basement and Sub basement | C60217 | 11/11/05 | $ 432,257.60 | 12/25/05 | $ 130,892.00 | 1129 | 11/14/05 | $ 130,892.00 |
| | | | | 05/19/06 | 118,780.00 | 1153 | 01/20/06 | 118,780.00 |
| | | | | 03/20/06 | 182,585.60 | 1156 | 02/02/06 | 182,585.60 |
| | | | 432,257.60 | | 432,257.60 | | | 432,257.60 |
| | C60256 | 01/11/06 | 114,051.48 | 01/23/06 | 17,423.00 | 1134 | 12/07/05 | 17,423.00 |
| | | | | 03/20/06 | 48,740.00 | 1141 | 12/14/05 | 48,740.00 |
| | | | | 06/05/06 | 22,440.00 | 10850 | 04/19/06 | 22,440.00 |
| | | | | 06/17/06 | 430.50 | 11163 | 04/19/06 | 430.50 |
| | | | | 06/09/06 | 4,572.66 | 11164 | 04/19/06 | 4,572.66 |
| | | | | 06/09/06 | 4,572.66 | 11170 | 04/19/06 | 4,572.66 |
| | | | | 06/09/06 | 4,572.66 | 11171 | 04/19/06 | 4,572.66 |
| | | | 114,051.48 | | 102,751.48 | | | 102,751.48 |
| | C60329 | 02/14/06 | 1,500,000.00 | | | 1162 | 09/13/06 | 47,190.00 |
| | | | | | | 1173 | 09/13/06 | 373,212.19 |
| | | | | | | 1174 | 09/13/06 | 2,599,294.14 |
| | | | 1,500,000.00 | 11/29/06 | 1,500,000.00 | | | 3,019,696.33 |
| | | | $2,046,309.08 | | | | | $ 3,554,705.41 |
| Floors 1-10 | C60134 | 10/12/05 | $ 499,997.86 | 11/10/05 | $ 395,260.30 | 1122 | 10/11/05 | $ 395,260.30 |
| | | | | 11/29/05 | 104,725.68 | 1126 | 11/10/05 | 104,725.68 |
| | | | 499,997.86 | | 499,985.98 | | | 499,985.98 |
| | C60192 | 10/27/05 | 500,000.00 | 11/29/05 | 214,474.45 | 1128 | 11/11/05 | 214,474.45 |
| | | | | 05/24/06 | 282,928.90 | 1125 | 01/02/06 | 282,928.90 |
| | | | 500,000.00 | | 497,403.35 | | | 497,403.35 |
| | C60219 | 11/11/05 | 500,000.00 | 12/24/05 | 200,817.55 | 1137 | 11/18/05 | 200,817.55 |
| | | | | 12/02/05 | 299,182.45 | 1127 | 11/10/05 | 299,092.45 |
| | | | 500,000.00 | | 500,000.00 | | | 499,910.00 |
| | C60254 | 01/11/06 | 2,394,798.90 | 01/23/06 | 263,261.25 | 1138 | 01/03/06 | 263,261.25 |
| | | | | 01/23/06 | 266,713.65 | 1142 | 01/03/06 | 266,713.65 |
| | | | | 01/23/06 | 264,342.45 | 1143 | 01/03/06 | 264,342.45 |
| | | | | 01/23/06 | 249,824.85 | 1144 | 01/03/06 | 249,824.85 |
| | | | | 03/11/06 | 330,015.70 | 1145 | 12/14/05 | 330,015.70 |
| | | | | 05/24/06 | 361,340.00 | 1146 | 01/02/06 | 361,340.00 |
| | | | | 01/23/06 | 51,874.70 | 1149 | 11/18/05 | 51,874.70 |
| | | | | 05/24/06 | 324,437.40 | 1150 | 01/02/06 | 324,437.40 |
| | | | | 08/11/06 | 3,613.40 | 1172 | 06/07/06 | 3,613.40 |
| | | | 2,394,798.90 | | 2,115,423.40 | | | 2,115,423.40 |
| | | | $3,894,796.76 | | $3,612,812.73 | | | $ 3,612,722.73 |
| | C60195 | 10/27/05 | 1,500,000.00 | | | | | 654,415.68 |
| | | | | | | | | 466,498.38 |
| | | | | | | | | 264,585.26 |
| | | | 1,500,000.00 | | | | | 1,385,499.32 |
| | C60204 | 10/27/05 | 750,000.00 | | | 22806 | 02/19/07 | 749,982.83 |
| | | | | | | | | 1,069,573.46 |
| | | | 750,000.00 | | | | | 1,819,556.29 |

**Appendix A**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | $2,250,000.00 | | | | | $ 3,205,055.61 |
| Exterior Surfaces, Fencing, Tree and Vegetation Removal | C60194 | 10/27/05 | $ 75,000.00 | 06/13/06 | $ 74,250.00 | 31306 | 05/16/06 | $ 74,971.07 |
| | | | | | | | | 97,209.50 |
| | | | | | | | | 172,180.57 |
| | C60216 | 11/11/05 | 75,000.00 | | | 31306 | 09/15/06 | 74,921.55 |
| | | | | | | | | 13,583.00 |
| | | | | | | | | 88,504.55 |
| | | | $ 150,000.00 | | $ 74,250.00 | | | $ 260,685.12 |
| | C60137 | 10/12/05 | 111,674.50 | 12/24/05 | 69,105.00 | 1121 | 11/23/05 | 69,105.00 |
| | | | | 03/15/06 | 10,815.50 | 1147 | 01/02/06 | 10,815.50 |
| | | | | 03/15/06 | 1,970.00 | 1170 | 03/09/06 | 1,970.00 |
| | | | | 03/20/06 | 3,800.00 | 1171 | 03/24/06 | 3,831.99 |
| | | | $ 111,674.50 | | $ 85,690.50 | | | $ 85,722.49 |
| Parking Garage | C60218 | 11/11/05 | $ 85,000.00 | | | 31006 | 04/11/07 | $ 119,111.06 |
| | | | $ 85,000.00 | | $ - | | | $ 119,111.06 |
| Building G | C60232 | 01/11/06 | $ 17,630.00 | 01/23/06 | $ 17,630.00 | 1132 | 01/03/06 | $ 17,630.00 |
| | C60233 | 01/11/06 | 44,201.75 | 01/23/06 | 39,788.00 | 1136 | 01/03/06 | 39,788.00 |
| | | | | 03/25/06 | 4,413.75 | 1152 | 02/02/06 | 4,413.75 |
| | | | 44,201.75 | | 44,201.75 | | | 44,201.75 |
| | | | $ 61,831.75 | | $ 61,831.75 | | | $ 61,831.75 |
| Misc. Electrical Work | C60221 | 11/11/05 | $ 391,655.20 | 03/15/06 | $ 34,082.20 | 1133 | 12/08/05 | $ 34,082.20 |
| | | | | 03/15/06 | 68,770.00 | 1135 | 12/14/05 | 68,770.00 |
| | | | | 3/15/056 | 29,784.00 | 1140 | 02/02/06 | 29,784.00 |
| | | | | 03/11/06 | 42,710.00 | 1151 | 02/02/06 | 42,710.00 |
| | | | | 03/15/06 | 116,093.00 | 1160 | 02/02/06 | 116,093.00 |
| | | | $ 391,655.20 | | $ 291,439.20 | | | $ 291,439.20 |
| Domestic Water System | C60332 | 02/14/06 | $ 48,740.00 | | $ - | | | $ - |
| Electric Steam Boiler in Room PG 101 | C60333 | 02/14/06 | $ 43,288.00 | | $ - | | | $ - |

AfterDisaster Claim

Basement and Subbasement

There were 3 POs issued related to remediation of the basement and subbasement including POs 60217, 60256, and 60329. For each PO, CCS was the prime contractor and AD performed as a subcontractor. POs 60217 and 60256 have been invoiced and paid and are not subject to dispute. PO 60329 was the subject of a claim filed by CCS and a subsequent complaint filed with the Court of Federal Claims. PO 60329 was the subject of a previously issued report.

Floors 1-10

There were 4 POs issued to CCS for work related to floors 1-10 including POs 60134, 60192, 60219, 60254 and 2 POs issued to AD, 60195 and 60204. Both AD POs are included in AD's claim. POs 60134, 60192, 60219, and 60254 have been invoiced and paid and are not subject to dispute.

Exterior Surfaces, Tree and Vegetation Removal, and Fencing

There were 3 POs issued for work related to cleaning of the exterior surfaces, fencing, and tree and vegetation removal including PO 60194, 60216, and 60137 respectively. POs 60194 and 60216 were issued to AD and are both included in the claim. PO 60137 was issued to CCS; costs have been invoiced and paid and are not subject to dispute.

Parking Garage

PO 60218 was issued for cleanup of the garage. This PO is part of AD's claim.

Building G

There were 2 POs, 60232 and 60233, issued to CCS related to the remediation of Building G; both POs have been invoiced and paid and not the subject of dispute.

Miscellaneous Electrical Work

PO 60221 was issued to CCS to perform certain miscellaneous electrical tasks to address identified deficiencies. This PO has been invoiced and paid and is not subject to dispute.

Domestic Water System

PO 60332 was issued to CCS for work related to the domestic water system. No costs were invoiced against this PO and it is not subject to dispute.

Steam Boiler

PO 60333 was issued to CCS for work related to installation of an electric steam boiler in Room PG 101. No costs were invoiced against this PO and it is not subject to dispute.

Remediation of Floors 1-10

PO 60134 was issued to CCS on October 12, 2005 by CO Pizarro for $499,997.86 including $349,997.86 identified for "dehumidification and air moving equipment to reduce humidity all floors." The PO also included $150,000 to "remove existing non-commercial refrigerators" as shown:

| Invoice | Original Date | Period | Total | Note |
|---|---|---|---|---|
| 1122 | 10/11/05 | 10/03/05 - 10/10/05 | $ 395,260.30 | 1 |
| 1126 | 11/10/05 | 10/11/05 - 10/18/05 | 104,725.68 | 2 |
| | | Total Invoices | $ 499,985.98 | |

Note 1 – This invoice included $281,749.90 for dehumidification, $10,010.40 to remove non-commercial refrigerators, and $103,500 for biocide related effort. The $103,500 effort was clearly outside the scope of the PO.

Note 2 – This invoice represented costs related to germicidal fogging and decontamination of hospital floors 5 through 10.

All costs submitted under PO 60134 have been paid.

PO 60192 was issued to CCS on October 27, 2005 by CO Pizarro for $500,000 to "provide all labor and materials for dehumidification of floors 1 through 10...this is a continuation of service to maintain equipment which was delivered ands set up under a previous PO No. 585-C60134."

Invoice # 1128, dated November 11, 2005 for $214,474.45 was charged against this PO. This invoice represented cost of germicidal fogging of floors 1 through 5 and the application of odor counteractant to floors 1 through 10. The invoiced amount of $214,474.45 has been paid.

PO 60219 was issued to CCS on November 11, 2005 by CO Pizarro for $500,000 to "provide all materials and labor to reduce and maintain humidity." Invoices submitted under this PO are shown below:

| Invoice | Original Date | Period | Total |
|---|---|---|---|
| 1127 | 11/10/05 | 10/19/05 - 10/25/05 | $ 299,182.45 |
| 1137 | 11/18/05 | 10/26/05 - 11/01/05 | 200,817.55 |
| | | Total Invoices | $ 500,000.00 |

Both invoices appear to relate directly to dehumidification effort for floors 1 through 10.

All costs submitted under this PO have been paid.

PO 60254 was issued to CCS on January 11, 2006 by CO Pizarro for $2,394,738.90 to cover "labor and materials required to continue dehumidification process established under previous PO." Invoices submitted under this PO are shown below:

**Appendix B**

| Invoice | Original Date | Resubmit Date | Period | Total |
|---|---|---|---|---|
| 1125 | 10/27/05 | 01/03/06 | 10/11/05 - 10/18/05 | $ 282,928.90 |
| 1149 | 11/18/05 | 01/03/06 | 10/26/05 - 11/01/05 | 51,874.70 |
| 1138 | 11/18/05 | 01/03/06 | 11/02/05 - 11/08/05 | 263,261.25 |
| 1142 | 11/23/05 | 01/03/06 | 11/09/05 - 11/15/05 | 266,713.65 |
| 1143 | 11/15/05 | 01/03/06 | 11/16/05 - 11/22/06 | 264,342.45 |
| 1144 | 11/30/05 | 01/03/06 | 11/23/05 - 11/29/05 | 249,824.85 |
| 1145 | 12/14/05 | n/a | 11/30/06 - 12/06/05 | 330,015.70 |
| 1150 | 12/14/05 | 01/02/06 | 12/07/05 - 12/13/05 | 324,437.40 |
| 1146 | 12/14/05 | 01/02/06 | 10/21/05 - 11/29/05 | 361,340.00 |
| 1172 | 06/07/06 | n/a | 10/21/05 - 11/29/05 | 3,613.40 |
| | | | | $2,398,352.30 |

All costs submitted under this PO have been paid.