# ATTACHMENT 3

AFTERDISASTER®
THE WATER AND FIRE EMERGENCY TEAM

Monday, March 10, 2008

Ms. Brenda Stewart, Contracting Officer, VISN 16 (10N16)

**Subject: Response to OIG Review of Southeast Restoration Costs Claimed for the Remediation of Floors 1-10 of VAMC New Orleans, dated March 3, 2008**

Following is AFTERDISASTER's response to the March 3, 2008 Report from Mark A. Myers, Director, Division A, Office of Contract Review (55), Office of Inspector General (OIG), Department of Veterans Affairs (VA).

**<u>Overview</u>**

Several statements in the OIG report which need clarification and correction.

Page 2, paragraph 2 of the OIG Report correctly quotes AFTERDISASTER's (AD's) assertion that AD never received copies of the Purchase Orders issued for remediation of Floors 1-10 of Veterans Affairs Medical Center (VAMC) New Orleans.

This is not just an assertion—it is a fact. Simply, Maria Pizzaro never sent AD any Purchase Orders as she promised in her written correspondence.

In fact, AD never received copies of any Purchase Orders until our attorney, Cyrus E. Phillips IV, obtained copies by a formal request made under the Freedom of Information Act.

This is extremely important because the OIG Report repeatedly refers to work requested and directives issued in the Purchase Orders, Purchase Orders which were never given to AD until July 17, 2007. Further, the OIG Report questions claimed remediation costs and these questions in the OIG Report are based on Purchase Orders which were never given to AD during the course of onsite performance at VAMC New Orleans.

Randy Braley repeatedly told AD that he had the authority to issue verbal Purchase Orders up to $25,000,000 and that written Purchase Orders were unnecessary due to the emergency circumstances which gave rise to the work underway at VAMC New Orleans.

P.O. Box 10393 • Greensboro, North Carolina 27404
Phone: 336-294-4321 • Toll Free: 1-800-948-0242 • Fax: 336-855-1144
E-mail: help@afterdisaster.com • Web: www.afterdisaster.com

The attached Affidavit documents that when Zack Howerton requested Purchase Orders on November 9, 2005 from Maria Pizzaro and Randy Braley, AD was threatened with Default and a Claim to be filed by VA against AD for any excess costs incurred after the termination.

This Affidavit records the clear direction to AD from Maria Pizzaro and Randy Braley that AD would perform without question the services that they requested AD to perform, else AD would be defaulted.

The scope of work, the procedures employed, and the services provided by AD are in direct accord with direction received from Randy Braley, Benjamin Coe, AMI Environmental, and from other VA officials.

AD President, Lee King, personally hand-delivered daily reports to Randy Braley (when onsite), to Benjamin Coe, as well as to AMI Environmental Representatives (Brian Gibson, Jarrod Frost, Dan Taylor, Jeff Mongar, and Chuck Epperson) providing detailed documentation of the direction received, the procedures implemented and the results achieved by AD. Occasionally, when AMI did not have an onsite representative available (Christmas Day, etc.), AD would leave our Daily Reports in AMI Environmental's office trailer, and email them an electronic copy of the Daily Report.

Additionally, the services we were providing were discussed at each morning's meeting with those same personnel, in addition to numerous VAMC staff, including Walter Heston, Nacelyn Lombard, Phil Boogaerts (until he resigned), Todd Donehoo and Odeal Scott.

It is unreasonable to bind AD to compliance with directives in written Purchase Orders to which we finally gained access years after the completion of the work and which are in conflict with verbal Purchase Orders and directives given by Randy Braley, Benjamin Coe and AMI Environmental.

As late as January 14, 2006, AD was still requesting copies of the Purchase Orders so that we could comply with their terms. One such electronic message from Lee King to Ben Coe dated January 14, 2006 9:49 AM says:

> *Ben,*
>
> *Please send me a copy of the PO for this work.* ***We want to make sure that we comply with it****. All we have on record is an email from Randy Braley that states "vegetation work."*
>
> *Thanks.*
>
> *Lee*

(Emphasis in bold text). AD never received a response to this electronic message.

While page 2, paragraph 7 of the OIG Report says “Some PO’s clearly state that it is “an estimated order” and that the Contractor “is not to exceed the amount on this PO without prior approval from the Contracting Officer,” the OIG Report then admits that these statements do not appear on all Purchase Orders.

Again, AD is being asked that its services and related invoices comport with Purchase Orders which it never saw until years after the provision of such services as directed by verbal Purchase Orders, and these verbal Purchase Orders were sometimes in conflict with the directives in the written Purchase Orders.

A review of the daily reports provided by AD to Randy Braley, Benjamin Coe and AMI Environmental clearly demonstrates AD’s painstaking effort to keep VA Contracting Officers and their designees informed of all services provided by AD.

Acceptance of these Daily Reports by the VA Contracting Officers and by AMI Environmental, VA’s on-site representative, was confirmation that AD had correctly understood, implemented, and planned the execution of all of the directives for services received.

At page 3, paragraph 1 the OIG Report claims that AD’s invoices were not submitted in a timely manner. We are puzzled as to what difference this would have made, since VA has yet to submit even one payment to AD in a timely manner, with some outstanding invoices still unpaid for over a year.

The OIG Report makes the statement that Xactimate “is not a billing system and does not capture actual costs….” The OIG Report also characterizes Xactimate as an estimating system. In actuality Xactimate is both a billing and an estimating software application program. When anticipated services are detailed in Xactimate an estimate results. When actual services performed are detailed in Xactimate an invoice results.

Xactimate provides line item activity codes and unit pricing for those activities based on the geographical area of the price list selected. This application program is not intended to “capture actual costs.”

The OIG report emphasizes that because of Xactimate’s inability to “capture actual costs,” creating an audit trail can be a significant issue. In this case the ability to “capture actual costs” was irrelevant.

There are in the OIG Report numerous misinterpretations of the underlying documentation. And there are inconsistencies in the OIG Report. The purpose of this Response is to provide clarification and corrections of these misinterpretations and inconsistencies.

Following are our specific responses and conclusions for each of the concerns in the OIG Report.

# 1. Review of Purchase Order 60195

## A. Error in Duct Cleaning Calculation

We have reviewed the underlying documentation. The correct price should be $4.60/sf and this should be applied to the square footage invoiced. The discrepancy is the result of a typographical error.

But the OIG Report is incorrect with regard to the Ceiling Square Footage applied to this mistake. The invoice was not based on the Ceiling Square Footage.

We have reviewed the actual square footage to which the incorrect rate was applied and the chart below shows our corrected calculations. We have provided screen shots of the actual square footage invoiced from a summary view within the Xactimate program called the "Summary Matrix." The resulting corrected questioned cost is detailed after the table and screen shots.

| VA OIG Report | | | | AFTERDISASTER Corrections | | |
|---|---|---|---|---|---|---|
| **Part** | **Ceiling Square Foot** | **Questioned Cost** | | **Actual Square Footage Invoiced** | **Corrected Questioned Cost** | |
| 10G | 24483.71 | $ | 7,345.11 | 24265.7 | $ | 7,279.71 |
| 9G | 27391.87 | $ | 8,217.56 | 27157.8 | $ | 8,147.34 |
| 1G | 22138.19 | $ | 6,641.46 | 8623.89 | $ | 2,587.17 |
| Totals | 74013.77 | $ | 22,204.13 | 60047.39 | $ | 18,014.22 |

Screen shot from summary matrix -10G Invoice




Screen shot from summary matrix -9G Invoice




Screen shot from summary matrix -1G Invoice




**CONCLUSION:** **The correct Questioned Cost for Purchase Order 60195 should be: $21,617.06 = $18,014.22 + $3,602.84 (10% overhead plus 10% profit).**

## B. Overcharge for HEPA Vacuuming and Damp Wipe with Germicide

We have reviewed each cleaning invoice in Xactimate, and we have carefully examined each door and window opening and whether the square footage covered by the opening was included in the wall square footage. All instances where these openings were included in the square footage were changed to reflect the exclusion of these openings from the wall square footage calculations.

This resulted in window and door opening square footages and linear footages being subtracted from wall square footage and linear footage calculations for all items such as cleaning, HEPA vacuuming, germicidal applications, cleaning base trim, and cleaning chair rails.

Xactimate does not provide for the exclusion of the square footage occupied by lights and registers. We believe that this is because Xactimate adjusts its unit costs to reflect the presence of these items on a wall or ceiling surface.

The calculations in the OIG Report reflect assumptions and suppositions about operation of the Xactimate program which are not accurate.

The following table displays the result of the corrected invoice calculations:

| Location | Original Invoice Amount | Corrected Amount | Correct Reduction for Questioned Amount |
|---|---|---|---|
| 10G | $ 654,415.68 | $ 654,043.07 | $ 372.61 |
| 9G | $ 466,498.38 | $ 466,155.01 | $ 343.37 |
| 1G/ER | $ 264,585.26 | $ 259,016.39 | $ 5,568.87 |
| Totals | $ 1,385,499.32 | $ 1,379,214.47 | $ 6,284.85 |

**CONCLUSION:** **The correct Questioned Cost for HEPA Vacuuming and Damp wipe with Germicide should be: $7,541.82 = $6,284.85 + 1,256.97(10% overhead plus 10% profit).**

**<u>SUMMARY CONCLUSION FOR PURCHASE ORDER 60195</u>**

**The total Questioned Cost for Purchase Order 60195 should be $29,158.88, not $44,595.94.**

## 2. Review of Purchase Order 60204

### <u>A. Number of Air Scrubbers</u>

The OIG Report says that the Statement of Work accompanying this Purchase Order (we are not familiar with either of these documents) includes this statement:

> Units [Air Scrubbers] shall be placed to accomplish one (1) air exchange per hour.

As stated previously, AD was never given either the written Purchase Order or the Statement Of Work and AD never received verbal direction in this regard.

AD provided Daily Reports to Benjamin Coe detailing procedures completed, procedures being performed, and procedures to be performed. These detailed Daily Reports clearly documented the installation of all Air Scrubbers.

AD was never told by Randy Braley, Benjamin Coe, or AMI Environmental that the installation of Air Scrubbers was in conflict with any Directive or Purchase Order issued or to be issued.

AD had been notified previously by Randy Braley and Benjamin Coe that AMI Environmental would be responsible for all Remedial Protocols. Additionally, AD was told that AMI Environmental would be responsible for monitoring AD's compliance with AMI Environmental's directives and protocols.

On November 8, 2005 AD received Remedial Protocols from AMI Environmental, and AMI Environmental was the VA's contracted safety and environmental consultant for VAMC New Orleans. AMI Environmental subcontracted with an environmental testing firm, Indoor Environmental Services (IES), to prepare these Remedial Protocols.

IES's Remedial Protocols (attached) were based on re-occupancy of VAMC New Orleans and, excluding the flooded parts, detailed the procedures to be used in remediation of the entire facility. The Remedial Protocols called for the installation of HEPA-filtered Air Scrubbers every 20 feet throughout the corridors of the non-flooded portions of VAMC New Orleans with multiple Air Scrubbers in large areas of VAMC New Orleans. The IES Remedial Protocols did not mention the number of air exchanges desired.

On November 8, 2005, the date of the release of the IES Remedial Protocols, AD began the installation of the Air Scrubbers required by these Remedial Protocols. Due to the limited availability of Air Scrubbers in New Orleans in the aftermath of Hurricane Katrina the Air Scrubbers were installed at VAMC New Orleans as received.

AD clearly disclosed in AD's Daily Reports that 103 Air Scrubbers were being installed during the period November 8, 2005 through November 17, 2005 and that 97 Air Scrubbers were being installed during the period November 21, 2005 through December 17, 2005. The final Air Scrubbers were received and installed on December 17, 2005.

Although fully aware of AD's activities during the installation of the Air Scrubbers, neither Randy Braley, neither Benjamin Coe, nor AMI Environmental told AD that AD was not following directives or existing Purchase Orders correctly.

It was our understanding based on conversations with Randy Braley, Benjamin Coe, and AMI Environmental that even at the time of issuance of the IES Remedial Protocols the future of VAMC New Orleans was uncertain and that numerous options were being explored and considered. In fact we were consulted on projects ranging from the cleanup of the entire facility to the cleanup of portions of floors within the facility.

During the time that options for the future of VAMC New Orleans were being considered AD was directed by Randy Braley, Benjamin Coe, and AMI Environmental to maintain and continue the installation of Air Scrubbers.

We were eventually directed to commence the cleaning of areas 10-G and 9-G. The Remedial Protocols specified that Air Scrubbers were to be installed in the rooms being cleaned and for these units to remain in place during the course of the cleaning and for a period of 24 hours after all of the cleaning was completed and the room was cleared as compliant. This cleaning of areas 10-G and 9-G and the rooms within these areas continued for over a month.

To accomplish these Remedial Protocols without installing even more Air Scrubbers we utilized Air Scrubbers which had previously been installed throughout VAMC New Orleans. IES agreed with this methodology. During the cleaning we moved selected Air Scrubbers from each floor to 10-G and 9-G as needed so as not to completely compromise the effectiveness of the remediation on those floors from which Air Scrubbers were removed.

You will note that there is not a charge for Air Scrubbers on the “cleaning” invoices for cleaning 10-G and 9-G, even though Air Scrubbers were directed to be used in this process.

We continued to invoice the Air Scrubbers under the Air Scrubber Purchase Order to eliminate the possibility of confusion and duplication. We can reallocate this cost to the Purchase Orders covering the cleaning of 10-G and 9-G if necessary.

It should be repeated that during the course of the installation and use of the Air Scrubbers AD provided Daily Reports to Randy Braley, Benjamin Coe, and AMI Environmental detailing all aspects of the installation and use of the Air Scrubbers. As part of its responsibilities on this project AMI Environmental verified that the installation was performed and AMI Environmental inspected the work site daily.

AD never received any comments or direction from Randy Braley, Benjamin Coe, or AMI Environmental challenging inappropriate installation or continued use of the Air Scrubbers.

A January 13, 2006 7:02 PM electronic message from Ben Coe to Lee King (copied to Randy Braley and AMI Representative Brian Gibson) says:

> *Lee*
>
> *After consulting with AMI representatives and CIH Mike Crandle, I along with Randy Braley have made the decision to shut down and remove all of the air scrubbers that have been placed throughout the NOVAMC as of 1/13/06. With the exception of those that are located within the basement and subbasement…*

*Thanks,*

*Benjamin. B. Coe*

Herein Mr. Coe confirms that he knows about the Air Scrubbers, he knows when they were running (until January 13, 2006, as confirmed in the Audit Report at page 9), and he knows where they were running (throughout VAMC New Orleans) as he directs us to remove them from everywhere except from the basement and sub-basement.

In summary, if Randy Braley, Benjamin Coe, or AMI Environmental thought that AD had too many Air Scrubbers in operation, AD should have been notified.

Rather, Benjamin Coe's and AMI Environmental's review of AD's Daily Reports and daily site inspections never precipitated any kind of request for a reduction in the number of Air Scrubbers, or even so much as a question about the number of Air Scrubbers in use.

**CONCLUSION:** **The charges for the number of Air Scrubbers and extension cords of $557,928 are correct and proper charges under Purchase Order 60204.**

**B. Duplication and Overcharge for 14 Air Scrubbers**

The OIG Report questions the possible duplication of costs for 14 Air Scrubbers.

The OIG Report says that the 7 Air Scrubbers invoiced to CCS Industrial Sales under Purchase Order 60329 and invoiced to the VA under invoice 1173 are the same 7 Air Scrubbers that AFTERDISASTER has invoiced to the VA under Purchase Order 60204.

This fact that there are line items for 7 Air Scrubbers on the invoices for both Purchase Orders is merely a coincidence.

The 7 Air Scrubbers which were invoiced under Purchase Order 60329 were comprised of 3 Air Scrubbers installed on October 11, 2005 and 4 Air Scrubbers installed on October 21, 2005. These Air Scrubbers were part of the original equipment inventory which AD mobilized from Greensboro, North Carolina. These had been part of our equipment inventory for several years and were separate and distinct from the units which were subsequently installed and invoiced under Purchase Order 60204.

These Air Scrubbers were installed pursuant to AMI Environmental's request that AD install Air Scrubbers at the elevator doors on the 1st floor and in stairwells near the basement and sub-basement due to concerns about toxic gasses using elevator shafts and stairways to enter the areas where VAMC New Orleans security guards were living.

On December 17, 2005 we installed an additional group of **7 New Air Scrubbers** in connection with Purchase Order 60204. These were not the same Air Scrubbers that had been installed on October 11 and 21, 2005 and invoiced under Purchase Order 60329.

The invoicing under Purchase Order 60329 and Purchase Order 60204 is correct. The questioned amount is in fact a valid charge.

The OIG Report questions the proper invoicing of the **7 New Air Scrubbers** which were installed on December 17, 2005 because of the following excerpt from our Daily Report of December 19, 2005 which says that on December 17, 2005:

> We replaced 7 air scrubbers needing repairs, with 7 new ones in 1-F . . .

This note is incomplete. The following additional information should have been included:

> On 12/17/05 we received the last of the air scrubbers ordered and installed **7 New Air Scrubbers.** Immediately upon installation we determined that although the Scrubbers were operational the motor housing brackets were loose. We returned these Air Scrubbers to the vendor for replacements. The 7 replacements were then installed in 1-F on the same day.12/17/05.

The replacements discussed in this note in the Daily Report of December 19 were actually replacements for 7 new Air Scrubbers installed on December 17, 2005 and then returned and re-installed that same day. Accordingly, there would be additional charges for these new Air Scrubbers under Purchase Order 60204.

**CONCLUSION:** **The charges for these units of $57,859.20 are correct and proper charges under Purchase Order 60204.**

**SUMMARY CONCLUSION FOR PURCHASE ORDER 60204**

**The questioned costs of $615,787.20 are correct and proper charges under Purchase Order 60204.**

## 3. Review of Purchase Order 60194

**A. Unnecessary Germicide Application**

Again, we did in fact state that we did not receive an "official copy" of this Purchase Order. Indeed, we did not receive any kind of copy of this Purchase Order until we received a copy of it from through the Freedom of Information Act. Having never received a copy of this Purchase Order precluded our ability to have followed it.

The City of New Orleans was contaminated with biohazardous and organic waste materials which flooded the first two floors of VAMC New Orleans, as well as all points of entrance, all walks, all drives, all ramps, and all curbs.

One of the primary goals at VAMC New Orleans (as explained to us by VA staff) was to render portions of VAMC New Orleans clean and safe which would allow VAMC New Orleans staff to treat Veterans needing emergency medical attention. This included life-saving treatments for dialysis patients.

Brian Gibson of AMI Environmental was the first representative on the scene who directed AD's activities.

Brian Gibson shared his concern with AD about the extreme contamination of the entire VAMC New Orleans property with biohazardous and organic waste materials contained in the flood water.

AD had several discussions with Mr. Gibson early on in the job with regard to the use of germicide on the walks, driveways and stairs covered by the flood water. At this time AMI Environmental had not completed testing the contamination nor did they have any conclusive reports regarding the level of contamination. Additionally Mr. Gibson was presumably approaching the project as a cleanup and reopening of the entire hospital.

Mr. Gibson agreed that the application of a germicide on the contaminated exterior hard surfaces after pressure washing would constitute a prudent approach to reducing the level of biohazardous and organic waste contamination to a minimum and restore the property to a safe condition.

AMI Environmental was so concerned about the degree of contamination that they directed us to also decontaminate all bags of debris which were being disposed of in roll-off containers. It is a very logical conclusion to draw that if bags of garbage need decontaminating before disposal, then all surfaces (i.e. sidewalks and parking decks) too would need similar germicidal decontamination.

Daily Reports support our direction from AMI Environmental when they say: "Continue removing bags of debris and large items from the rooms in the basement. We are decontaminating the bags/contents as they are removed from the building, and then placing them into lined roll-off containers." Other Daily Reports make similar statements summarizing our services as "decontaminating the bags/contents as they are removed from the building."

In general medical facilities have much higher standards for sanitation than any other public facilities to safely and effectively accomplish the mission that they are charged with.

In light of the underlying medical mission of VAMC New Orleans, we believed that Mr. Gibson's concurrence were the appropriate procedures in this situation considering the

presence of security guards living in the hospital, the presence of workers onsite, and the presence of VA personnel.

It is our professional opinion that the risk of cross contamination would have remained at unacceptable levels without the application of germicide.

To presume that applying germicide only inside the hospital was sufficient would be minimizing an extremely hazardous and unsafe work condition. The fact that the environmental company required everything inside of all work areas to be both fogged and wiped down with germicide (sometimes more than once) should offer sufficient proof that the areas outside the hospital (which sustained much more severe levels of contamination) also needed similar germicidal treatments.

Also in consideration of the amount of foot traffic over the contaminated surfaces and into the hospital the risk of cross contamination was high, so high that Mr. Gibson later directed that adhesive mats be placed at each entrance for individuals entering the hospital to walk across to remove contamination from the soles of their shoes.

Additionally we were directed to supply hundreds of pairs of blue sterile “booties” at every point of entrance to VAMC New Orleans for entering individuals to use. We were directed to employ both of these steps by AMI Environmental not in order to prevent contamination from being tracked *out* of VAMC New Orleans, but to prevent it from being tracked *into* VAMC New Orleans (from the outside).

Both AMI Environmental representatives and VAMC New Orleans representatives saw all of this in process daily and were provided Material Safety Data Sheets on all products being used.

We believe that the treatment of the exterior surface was prudent and warranted, given the circumstances. Mr. Gibson’s concurrence with and inspection of these treatments also supported this approach. Additionally, this was consistent with the directed application of germicide throughout the facility.

**CONCLUSION:** **The questioned charges for these units of $24,871.77 are correct and proper charges under Purchase Order 60194.**

**<u>SUMMARY CONCLUSION FOR PURCHASE ORDER 60194</u>**

**The questioned costs of $24,871.77 are correct and proper charges under Purchase Order 60194.**

## 4. Review of PO 60218

### <u>A. Claimed Cost for Sweeping</u>

Again, AD was not privy to the written Purchase Orders.

Sweeping was not initially anticipated because we were told that the parking decks would not be used. However, repeated traffic by VAMC New Orleans staff and other contractors, over whom we had no control, resulted in tremendous amounts of debris (and contamination) moved from lower levels on an ongoing basis.

The OIG Report apparently does not contest overtime which was not originally anticipated. However, what may not be obvious is the reason that we had to work overtime – the VAMC New Orleans staff traffic was so heavy in the parking decks during the daytime, we had to work at nights to avoid continual traffic and damage to their vehicles.

Also, each night all of our equipment had to be packed up and moved out of the way for the next morning's traffic in the parking deck, which was not contemplated in either the original proposal we provided or in the Purchase Order, which we never received.

We have reviewed the underlying electronic messages about sweeping/pressure washing of the parking garage.

Our last correspondence on November 7, 2005 requested written clarification on the Purchase Order/Task Order about the specific steps we were to perform (sweep only, pressure wash only, sweep and pressure wash, sweep and pressure wash only in some places, etc.)

We have reviewed all correspondences and cannot find evidence of a written clarification of the services to be performed.

Although we did receive a verbal Purchase Order for $85,000 from the VA, we were not given details as to the tasks included.

Accordingly we began to pressure wash the parking garage. It quickly became evident that the amount of debris deposited by Hurricane Katrina and the obvious unattended condition of the parking garage mandated the necessity of sweeping prior to power washing.

AD proceeded to provide the services necessary to facilitate and accomplish the pressure washing of the garage.

It should also be noted that the VA's previous handling of Purchase Order amounts indicated that the verbal amounts given were subject to change depending on the circumstances of the job. By this time the VA had paid and revised numerous Purchase Order amounts in connection with services provided by AD as a subcontractor to CCS Industrial Sales, Incorporated.

Simply, AD has invoiced for the services performed in pressure washing the garage. The VAMC New Orleans benefited from these services. Additionally, AD has honored its offer of a 50% discount on the services provided.

And, although this additional expense is not contemplated in the final invoice, we incurred significant additional labor due to the loss in water pressure. This is confirmed in several Daily Reports as well as in many calls to VAMC New Orleans staff to find out what could be done to generate adequate water pressure. We were repeatedly assured that the water pressure would be corrected so that progress could resume, but it never did while we were onsite.

**CONCLUSION:** **The questioned charges for these units of $36,852.74 are correct and proper charges under Purchase Order 60218.**

**SUMMARY CONCLUSION FOR PURCHASE ORDER 60218**

**There questioned costs of $36,852.74 are correct and proper charges under Purchase Order 60218.**

**OVERALL SUMMARY CONCLUSION**

Our conclusions regarding the five Purchase Orders in question are summarized in the following table:

| PO | Original Invoice | Additional Claimed Amount | Total Claim | AFTERDISASTER Revised Questioned | Not Questioned |
|---|---|---|---|---|---|
| 60195 | 1,385,499.32 | 0.00 | 1,385,499.32 | 29,158.88 | 1,356,340.44 |
| 60204 | 749,982.83 | 1,069,573.46 | 1,819,556.29 | 0.00 | 1,819,556.29 |
| 60194 | 721.07 | 97,209.50 | 97,930.57 | 0.00 | 97,930.57 |
| 60216 | 74,921.55 | 13,583.00 | 88,504.55 | 0.00 | 88,504.55 |
| 60218 | 84,704.91 | 34,406.14 | 119,111.05 | 0.00 | 119,111.05 |
| Total | 2,295,829.68 | 1,214,772.10 | 3,510,601.78 | 29,158.88 | 3,481,442.90 |

The result of our review indicates that the total due on these five Purchase Orders is $3,481,442.90. AD concedes that $29,158.88 has been mistakenly billed under Purchase Order 60195.

Sincerely,

δ

Lee King, President
AFTERDISASTER